# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **KIMBERLY D. CHURCH,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:07cv00045 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: Pamela Meade Sargent |
| Defendant | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Kimberly D. Church, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq*. (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

Case 2:07-cv-00045-JPJ-PMS   Document 25   Filed 06/24/08   Page 1 of 29   Pageid#: 56

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Church protectively filed her applications for DIB and SSI on June 27, 2005, alleging disability as of August 31, 2003, based on fibromyalgia, hypothyroidism and partial deafness. (Record, ("R."), at 53-56, 73, 91, 226-29.) The claim was denied initially and upon reconsideration. (R. at 38-40, 44, 45-47.) Church then requested a hearing before an administrative law judge, ("ALJ"). (R. at 48.) The ALJ held a hearing on March 6, 2007, at which Church was represented by counsel. (R. at 307-51.)

By decision dated May 11, 2007, the ALJ denied Church's claims. (R. at 14-24.) The ALJ found that Church met the disability insured status requirements of the Act for DIB purposes through December 31, 2006.[1] (R. at 16.) The ALJ found that Church had not engaged in substantial gainful activity since August 31, 2003. (R. at 16.) The ALJ also found that the medical evidence established that Church suffered from severe impairments, namely fibromyalgia, osteoarthritis with low back pain, hypothyroidism, partial deafness, hypertension and depression, but she found that Church did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-17.) The ALJ found that Church's allegations regarding the intensity, persistence and

---

[1]Thus, Church must show disability on or prior to December 31, 2006, in order to be eligible for DIB benefits.

limiting effects of her symptoms were not entirely credible. (R. at 22.) The ALJ found that Church had the residual functional capacity to perform a limited range of light work.[2] (R. at 20.) Specifically, the ALJ found that Church could lift or carry items weighing up to 10 pounds frequently and up to 20 pounds occasionally, that she could sit, stand or walk about six hours each in an eight-hour workday, that she could not perform overhead lifting or frequent pushing/pulling with her arms, that she could occasionally bend, stoop, crouch, crawl, kneel, balance and climb, that she could not be exposed to noisy environments or hazardous machinery, that she was limited to occasional use of the telephone, that she was limited to simple, noncomplex tasks, that she could interact adequately with co-workers, supervisors and the public and that she could maintain concentration, persistence or pace for an eight-hour workday for simple tasks. (R. at 20.) Thus, the ALJ concluded that Church could not perform her past relevant work as a hairdresser. (R. at 22.) Based on Church's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that she could perform, including those of a sedentary[3] surveillance monitor and a fast food worker, a gate guard and a ticket taker, all at the light level of exertion. (R. at 22-23.) Therefore, the ALJ concluded that Church was not disabled under the Act and was not eligible for DIB or SSI benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2007).

[3]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. *See* 20 C.F.R. §§ 404.1567(a) and 416.967(a) (2007).

-3-

After the ALJ issued his decision, Church pursued her administrative appeals, (R. at 10), but the Appeals Council denied her request for review. (R. at 6-9.) Church then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2007). The case is before this court on Church's motion for summary judgment filed February 20, 2008, and the Commissioner's motion for summary judgment filed March 20, 2008.

## *II. Facts*

Church was born in 1967, (R. at 54), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education with training in cosmetology. (R. at 96.) Church has past relevant work as a hairdresser. (R. at 92.)

Church testified that she was a certified beautician by the time she graduated from high school and that she continued to be certified even though she had not worked since August 2003. (R. at 322.) She stated that she ran her own salon until she became pregnant, at which time she went to work for someone else. (R. at 323-24.) She stated that she had intended to return to work after her daughter was born in September 2003, but had developed many health problems during her pregnancy, including hypothyroidism, high blood pressure, depression and fibromyalgia. (R. at 325-26.) Church stated that she had never seen a psychiatrist or counselor for her depression, but that she had been prescribed Prozac once and never took it because she feared the side effects. (R. at 326.) Church stated that, although her hypothyroidism was controlled with medications, her hypertension was not. (R. at 326-27.) She

-4-

testified that her doctors had told her that losing weight would help reduce her blood pressure, but she stated that she could not exercise due to joint and muscle pain. (R. at 327.) Church testified that Dr. Bible, a rheumatologist, had diagnosed her with fibromyalgia, and that he also had told her to exercise to improve her condition. (R. at 328.) Church stated that she had difficulty sleeping, for which she occasionally took Elavil. (R. at 328-29.) She stated that she took Tramadol for pain, but that it caused her to be sleepy. (R. at 329.)

Church testified that she was totally deaf in her right ear and partially deaf in her left ear and that hearing aides would not help her because she had nerve deafness. (R. at 330.) She explained that she had no difficulty communicating with people as long as she was facing the person and as long as there was not background noise. (R. at 330.) She stated that she and her boyfriend watched television, but she had to turn it up loud. (R. at 331.) Church stated that she suffered from fatigue requiring her to lie down during the day. (R. at 335.)

Church testified that she tried to play with her three-year-old daughter as much as she could and that she read to her. (R. at 320-21.) She stated that her mother and aunt helped care for her daughter daily. (R. at 329-30.) Church testified that she could not sit or stand for long periods and could not drive long distances. (R. at 332, 348.) She stated that she occasionally grocery shopped with her mother's help. (R. at 333.) Church testified that she could perform housework a little at a time and that her mother and aunt performed the household chores that she could not do. (R. at 335.) She testified that she had to elevate her feet and legs a couple of times daily for 30 to 45 minutes due to ankle swelling. (R. at 336.) Church stated that, although she

-5-

had anticipated that her problems, which started while she was pregnant, would subside once she had her child, they, instead, worsened. (R. at 337.) She stated that she could barely raise her arms. (R. at 337.) Church testified that activity and stress worsened her pain. (R. at 337-38.) She stated that she had difficulty concentrating and that her blood pressure typically stayed high despite taking two blood pressure pills daily. (R. at 338-39.) Church stated that she saw health professionals approximately once or twice monthly. (R. at 348.) She estimated that she could do "very little" approximately two weeks out of the month. (R. at 348.) Church stated that three or four days weekly she had extreme pain and other symptoms that precluded her from leaving her house. (R. at 349.) She testified that she had neither looked for work nor sought vocational rehabilitation. (R. at 333.)

Bonnie Martindale, a vocational expert, also was present and testified at Church's hearing. (R. at 340-47, 349-50.) Martindale classified Church's past relevant work as a hairdresser or beautician as light and skilled. (R. at 341.) Martindale was asked to assume a hypothetical individual of Church's age, education and work history who could perform light work with some limitations, including an inability to frequently push and/or pull with the hands and arms, to lift overhead and to work in a noisy environment or around dangerous machinery, who could use the phone no more than occasionally, who experienced a mild reduction in concentration and who could occasionally climb, balance, kneel, crouch, crawl and stoop. (R. at 341-42.) Martindale testified that if frequent reaching were precluded, such an individual could not perform Church's past relevant work. (R. at 342-43.) However, Martindale testified that such an individual could perform the light jobs of a fast food worker, a ticket taker and a gate guard. (R. at 343-44.) She stated that although a fast food

-6-

worker job was generally a stand-up job, a sit/stand option might be available for the ticket taker job.  (R. at 344.)  Martindale testified that such an individual also could perform the sedentary job of a surveillance monitor.  (R. at 344.)  She testified that the surveillance monitor would not be allowed occasional postural changes.  (R. at 344.)  Martindale testified that all of these jobs would require an individual to work on a consistent and regular basis, and an individual who had to lie down at unscheduled times during the day, could not perform any jobs.  (R. at 346.)  Martindale further testified that the jobs enumerated required only "very low level concentration."  (R. at 347.)  She testified that an individual would be allowed to miss approximately one and one-half to two days of work per month.  (R. at 347.)  Thus, Martindale testified that an individual who could not perform eight-hour workdays at a steady pace, generally could not keep a job.  (R. at 350.)

   In rendering her decision, the ALJ reviewed records from Dr. Charles P. Maine, M.D.; Norton Community Hospital; Dr. Michael W. Bible, M.D., a rheumatologist; Wellmont Health System; Dr. H. Thomas Brock Jr., M.D.; Highlands Pathological Consultants; Remote Area Medical Project; Dr. Kevin Blackwell, D.O.; Dr. Olimpo Fonseca, M.D.; Rebecca Mullins, a family nurse practitioner; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Frank M. Johnson, M.D., a state agency physician; Richard J. Milan Jr., Ph.D., a state agency psychologist; E. Hugh Tenison, Ph.D., a state agency psychologist; Dr. Timothy O. McBride, M.D.; and Arthritis Associates.   Church's attorney also submitted medical reports from William R. Andrews, a physical therapist at Apple Rehab, and Norman E. Hankins, Ed.D., a

vocational expert, to the Appeals Council.[4]

On February 21, 2003, Church saw Dr. Charles P. Maine, M.D., for an evaluation of abnormally high thyroid suppression hormone, ("TSH"), levels. (R. at 128.) Church was pregnant, but complained of fatigue beginning before her pregnancy. (R. at 128.) Dr. Maine noted a small palpable goiter bilaterally, a little more prominent on the left. (R. at 128.) He further noted that Church was deaf in the right ear with some decreased hearing in the left ear, presumably related to a childhood illness. (R. at 128.) He diagnosed hypothyroidism, prescribed Synthroid and scheduled a thyroid sonogram. (R. at 128.) On March 25, 2003, Dr. Maine noted that the sonogram of the neck showed a normal sized thyroid gland with no definite nodules present. (R. at 127.) On June 24, 2003, Church stated that she felt "great," and Dr. Maine noted that her thyroid was not palpable. (R. at 126.) On December 10, 2003, despite Church's complaints of occasional pain in her heels, she stated that she felt "fairly well." (R. at 125.) Dr. Maine again noted a palpable thyroid with a small goiter. (R. at 125.) Physical examination revealed tenderness of the right heel with intact pedal pulses, negative straight leg testing and a nontender back. (R. at 125.) He advised Church to add sponges to her shoes for padding, he gave her a trial of Vioxx, and he advised her to continue Synthroid. (R. at 125.) On December 12, 2003, Dr. Maine increased Church's dosage of Synthroid. (R. at 126.)

X-rays taken on January 2, 2004, showed a small bone spur, and Church

---

[4]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 6-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

complained of foot pain.  (R. at 125.)  On June 10, 2004, Church noted becoming very hot at times and perspiring, as well as occasional joint pain, especially in the right knee and left ankle, with a lot of morning stiffness.  (R. at 124.)  Physical examination revealed a minimally palpable thyroid, clear lungs, full range of motion of the knees with crepitation, a little swelling of the left ankle, no evidence of nodules and no physical stigmata of rheumatoid arthritis.  (R. at 124.)  Dr. Maine diagnosed perspiring episodes, possibly due to excess Synthroid, and arthralgias of unclear etiology.  (R. at 124.)  He stated that rheumatoid arthritis would be considered, and he gave Church a trial of Bextra.  (R. at 124.)  On June 16, 2004, Dr. Maine increased Church's dosage of Synthroid.  (R. at 124.)  On July 16, 2004, Church continued to complain of myalgias, more in the left ankle with some stiffness in the hands.  (R. at 123.)  Her sedimentation rate and rheumatoid factor were normal.  (R. at 123.)  Church stated that Vioxx and Bextra had not provided much relief, and Dr. Maine reported that he was unsure as to the cause of her symptoms.  (R. at 123.)  Church had a full range of motion of all of her joints and mild tenderness in the left ankle.  (R. at 123.)  Dr. Maine advised an x-ray, and he gave her a trial of Mobic.  (R. at 123.)  Dr. Maine noted again that it was unclear why Church had the myalgias and arthralgias, but he noted no certain clinical evidence of rheumatoid arthritis.  (R. at 123.)  However, he ordered a check of certain enzyme levels, stating that if those were abnormal, further investigation would be necessary.  (R. at 123.)

On October 25, 2004, Church saw Rebecca Mullins, a family nurse practitioner for Dr. Olimpo Fonseca, M.D.  (R. at 161.)  Physical examination revealed some tenderness on palpation of the cervical spine, tenderness in the thoracic spine down into the paraspinal areas of the lumbosacral spine and some tenderness on palpation

of the lateral aspects of both knees. (R. at 161.) Mullins diagnosed low back pain and bilateral knee pain and encouraged Church to obtain an arthritis panel. (R. at 161.) She was given a steroid dose pack, ibuprofen, Ultram and Lidoderm patches. (R. at 161.) On November 8, 2004, Church stated that she felt worse, noting that the ibuprofen helped "some," but that the other medications did not. (R. at 160.) Physical examination showed tenderness in the lumbosacral spine on palpation with limited range of motion and painful bilateral knees with ambulation. (R. at 160.) Mullins diagnosed chronic low back pain and bilateral knee pain and ordered an x-ray of Church's lumbosacral spine and knees, as well as an MRI of the lumbosacral spine. (R. at 160.) Church was referred to Southeastern Pain Management, and Mullins prescribed Lortab and Zanaflex. (R. at 160.) Lab work performed the same day revealed negative antinuclear antibody, ("ANA"), testing. (R. at 173-74.) Church's triglycerides were high, her high density lipoprotein, ("HDL"), cholesterol was low and her T3 uptake was high, as was her free thyroxin index. (R. at 171.) X-rays of the right knee, taken on November 17, 2004, were normal. (R. at 170.)

On November 30, 2004, Church complained of persistent symmetrical joint pain, mostly in the knees, elbows, wrists, ankles and hands. (R. at 159.) She reported relief with Lortab and Zanaflex. (R. at 159.) Church appeared to be in some distress and was quite uncomfortable when the joints were examined. (R. at 159.) Dr. Fonseca noted that involvement was mostly in the knees, elbows and wrists, as well as the second and third finger in the proximal interphalangeal, ("PIP"), joint. (R. at 159.) Church exhibited some stiffness when she got up and moved around. (R. at

-10-

159.) Dr. Fonseca "strongly suspect[ed]" that Church had seronegative arthritis.[5] (R. at 159.) He also diagnosed hypothyroidism, but hyperthyroid with medication. (R. at 159.) Dr. Fonseca decreased Church's dosage of Synthroid, refilled her Zanaflex and Lortab prescriptions and prescribed Clinoril. (R. at 159.) He referred her to a rheumatologist for further evaluation of possible seronegative rheumatoid arthritis. (R. at 159.)

In a January 6, 2005, letter, Dr. Michael W. Bible, M.D., a rheumatologist, diagnosed Church with fibromyalgia syndrome. (R. at 131-32.) He noted no evidence of an underlying inflammatory arthritis, particularly that of rheumatoid arthritis. (R. at 131.) Dr. Bible informed Church that fibromyalgia did not lead to arthritis or deformity and seldom to disability. (R. at 131.) He further informed her that consistent exercise was the primary treatment for and the primary mode of dealing with pain and stiffness. (R. at 131.) Dr. Bible recommended a daily walking program, beginning at 1/4 mile each day, gradually working up to at least two miles daily. (R. at 131.)

On January 10, 2005, Church saw Dr. Fonseca with complaints of back pain, knee pain and shoulder pain, which was bilateral and symmetrical. (R. at 156.) Dr. Fonseca indicated that Church was "strongly motivated" to exercise. (R. at 156.) However, Church stated that she did not wish to return to work at that time. (R. at 156.) Physical examination revealed a nontender, but palpable, goiter, as well as tender knees and shoulders. (R. at 156.) Dr. Fonseca's notes reflect that Church had

---

[5]Seronegative arthritis refers to arthritis that shows negative results on serological examination. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1511 (27th ed. 1988).

lost weight, but they did not state how much. (R. at 156.) Church's blood pressure was 130/90. (R. at 156.) Dr. Fonseca diagnosed fibromyalgia, labile hypertension, hypothyroidism and dislipidemia, mixed, with low HDL. (R. at 156.) He advised Church to take a baby aspirin daily and to cut down on pain medication as much as possible. (R. at 156.) Nonetheless, Dr. Fonseca refilled Church's Lortab prescription and ordered further laboratory testing. (R. at 156.) On March 7, 2005, Mullins again diagnosed fibromyalgia, and Church underwent laboratory testing per Dr. Fonseca's order. (R. at 155.) She was again prescribed Lortab, and Mullins noted that Church would be weaned off until she went to pain management or completely stopped taking it. (R. at 155.) Lab work showed high triglycerides, cholesterol, very low density lipoproteins, ("VLDL"), and low density lipoproteins, ("LDL"), and low HDL. (R. at 169.) Thyroid testing was normal. (R. at 168.) On April 4, 2005, Church's blood pressure was 140/100. (R. at 154.) She was given samples of Benicar and was instructed to keep a blood pressure log. (R. at 154.) Church was again prescribed Ultram and Lortab. (R. at 154.) On May 2, 2005, Dr. Fonseca stated that weaning Church off of Lortab was a "good approach" for her chronic disorder. (R. at 153.) He noted that Church could not tolerate the Benicar. (R. at 153.) Her blood pressure was 130/100, and Church appeared to be in some distress. (R. at 153.) Physical examination showed multiple trigger points with tenderness for fibromyalgia. (R. at 153.) No pedal edema was present. (R. at 153.) Church was again diagnosed with fibromyalgia, hypertension and mixed lipidemia. (R. at 153.) Dr. Fonseca prescribed Atenolol, Daypro and Desyrel, and he refilled her prescriptions for Lortab and Ultram. (R. at 153.)

On June 27, 2005, Church reported that her blood pressure had been "ok" at

home.  (R. at 152.)  She stated that Lortab helped to control her pain much better than Ultram.  (R. at 152.)  Dr. Fonseca again noted that Church had been discouraged from continuing to use Lortab given the chronic nature of her condition.  (R. at 152.)  Church had been very compliant with her diet and activity and had lost 44 pounds.  (R. at 152.)  Her blood pressure was 120/70.  (R. at 152.)  Physical examination showed periarticular tenderness of the extremities.  (R. at 152.)  She was diagnosed with hypertension, well-controlled, fibromyalgia, obesity, improving, osteoarthritis, mixed lipidemia and hypothyroidism.  (R. at 152.)  Dr. Fonseca refilled the Atenolol, Daypro, Ultram and Desyrel.  (R. at 152.)  Lab work completed the following day showed that Church continued to have high triglycerides, VLDL and LDL.  (R. at 167.)  Although diet and exercise had improved Church's "numbers," it was noted that she needed medication.  (R. at 167.)  She was prescribed Lipitor.  (R. at 167.)  On July 25, 2005, Church complained of left hip pain, noting that her pain had worsened since not taking pain medication.  (R. at 151.)  She expressed a desire to seek pain management.  (R. at 151.)  Physical examination showed left hip tenderness with palpation.  (R. at 151.)  Church was fully oriented and cooperative and had normal psychomotor skills, normal speech and goal-oriented thought processes.  (R. at 151.)  Mullins diagnosed left hip pain, fibromyalgia and depression.  (R. at 151.)  She ordered an x-ray of the left hip and physical therapy for muscle strengthening and joint pain.  (R. at 151.)  Church was prescribed Benadryl, Lexapro and Lortab.  (R. at 151.)  An x-ray of the left hip, taken on July 29, 2005, yielded normal results.  (R. at 162.)

On July 31, 2005, Church underwent sight and hearing testing at a Remote Area Medical, ("RAM"), clinic, the results of which were abnormal.  (R. at 140-41.)

-13-

Further evaluation revealed mild hearing loss in the left ear and profound hearing loss in the right ear. (R. at 141.) Church saw Dr. Kevin Blackwell, D.O., for a consultative examination on September 16, 2005. (R. at 142-46.) She complained of joint pain in the ankles, hips, elbows, hands and back, worsened by increased activities. (R. at 142.) Church also reported stiffness on a regular basis and constant pain that radiated into her left leg. (R. at 142.) She denied any bowel or urinary dysfunction, but reported multiple tender areas along her back. (R. at 142.) Church informed Dr. Blackwell that she had nerve damage in her right ear with subsequent hearing loss. (R. at 142.) Physical examination revealed a blood pressure of 110/80. (R. at 143.) Church was alert and oriented and was in no acute distress with a good mental status. (R. at 143.) No cyanosis or edema of the extremities was noted, and her gait was symmetrical and balanced. (R. at 144.) Church's shoulder and iliac crest heights were good and equal bilaterally. (R. at 144.) She had tenderness along the lateral aspect of the hips bilaterally, tenderness along the intertrochanteric muscles and along the periscapular muscles bilaterally. (R. at 144.) The remainder of Church's joint examination revealed no effusions or obvious deformities or redness. (R. at 144.) Upper and lower extremities were normal for size, shape, symmetry and strength. (R. at 144.) Her grip strength was good, and her fine motor movement skills with the hands were normal. (R. at 144.) Church's upper and lower reflexes were good and equal bilaterally. (R. at 144.) Romberg's sign[6] was negative. (R. at 144.)

Dr. Blackwell diagnosed Church with fibromyalgia, hypertension and hypothyroidism. (R. at 144.) He opined that she could lift items weighing up to 30

---

[6]Romberg's sign is a swaying of the body or falling when standing with the feet close together and the eyes closed. *See* Dorland's at 1525.

-14-

pounds maximally and up to 10 pounds frequently. (R. at 144.) Dr. Blackwell further opined that Church could sit for eight hours in an eight-hour workday and stand for six hours in an eight-hour workday, assuming normal positional changes. (R. at 144.) He imposed no limitations on hand usage, and he noted that she required mild increase in voice conversation levels to hear a normal conversational level. (R. at 144-45.) Dr. Blackwell opined that Church should avoid squatting, kneeling and crawling, and he indicated that a functional capacity evaluation might better delineate objectively her limitations. (R. at 145.)

On September 30, 2005, Dr. Richard M. Surrusco, M.D., a state agency physician, completed a physical residual functional capacity assessment, finding that Church could perform light work. (R. at 175-82.) Dr. Surrusco imposed no postural, manipulative, visual or environmental limitations. (R. at 177-78.) He noted that her ability to hear was limited. (R. at 178.) Dr. Surrusco found Church's allegations partially credible. (R. at 181.) He noted that Dr. Blackwell's findings were partially consistent with his findings. (R. at 181.) Dr. Surrusco's findings were affirmed by Dr. Frank M. Johnson, M.D., another state agency physician, on May 4, 2006. (R. at 179.)

Also on September 30, 2005, Richard J. Milan Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Church had no medically determinable mental impairment. (R. at 183-96.) This finding was affirmed by E. Hugh Tenison, Ph.D., another state agency psychologist, on May 4, 2006. (R. at 183.)

-15-

On October 21, 2005, Church exhibited tenderness of the lumbosacral spine on palpation, and Mullins diagnosed her with degenerative disc disease of the lumbosacral spine. (R. at 150.) She referred Church to pain management. (R. at 150.) On July 19, 2006, Church saw Dr. Timothy O. McBride, M.D., who noted that Elavil had improved Church's sleep. (R. at 217.) Her blood pressure was 140/88. (R. at 217.) An examination of Church's extremities was described as "relatively unremarkable." (R. at 217.) Dr. McBride noted palpable trigger points throughout Church's entire body. (R. at 217.) He prescribed Lodine. (R. at 217.) Because Church's TSH levels were elevated at her previous visit, indicating uncontrolled hypothyroidism, Dr. McBride increased her dosage of Synthroid. (R. at 217.) Church saw Dr. McBride again on August 30, 2006, for repeat TSH testing. (R. at 216.) Church reported feeling "much better" since her Synthroid was increased, but she reported continued pain secondary to fibromyalgia. (R. at 216.) Church stated that she was trying to exercise daily. (R. at 216.) Her blood pressure was 150/90. (R. at 216.) She had no edema of the extremities. (R. at 216.) Church was diagnosed with fibromyalgia, essential hypertension and hypothyroidism. (R. at 216.) Dr. McBride continued Church's dosage of Synthroid, and he prescribed Diovan. (R. at 216.) When she admitted to taking a family member's Lortab, Dr. McBride discouraged her from doing this, as it was illegal. (R. at 216.)

On October 11, 2006, Church was seen at Arthritis Associates. (R. at 218, 220-23.) Although Church had no metacarpophalangeal, ("MCP"), synovitis, and she exhibited mild tenderness of the second and third PIP joints of the left hand, Church had a full range of motion of the upper extremities. (R. at 222.) No synovitis of the lower extremities was noted, but the metatarsal-phalangeal, ("MTP"), joints were

-16-

mildly tender without swelling. (R. at 222.) Church had fine crepitus of the knees, but a good range of motion. (R. at 222.) Her back was nontender, and her deep tendon reflexes were 2+ in the upper extremities and 1+ in the lower extremities. (R. at 222.) Church was diagnosed with chondromalacia of the patella.[7] (R. at 223.) Church was again seen at Arthritis Associates on November 16, 2006. (R. at 218.) She reported that her legs had improved some and that she was sleeping better with regular use of Elavil. (R. at 218.) She reported some neck and shoulder soreness. (R. at 218.) Church had no synovitis of the hands and a full range of motion, but she exhibited point tenderness in the shoulder. (R. at 218.) Her left trochanter was very tender with pain on range of motion. (R. at 218.) A trial of selective serotonin reuptake inhibitor, ("SSRI"), was initiated. (R. at 218.)

On December 4, 2006, Dr. Fonseca responded to a request by Church's attorney for information regarding Church's physical impairments. (R. at 198-99.) Dr. Fonseca indicated that the symptoms alleged by Church could reasonably occur, based on his clinical observations and other medical findings and reports available to him. (R. at 199.) He further indicated that, due to Church's combined impairments, resulting symptoms and medications prescribed for their treatment, she could not sustain work activity on a regular and consistent basis. (R. at 199.) Dr. Fonseca opined that Church was disabled from any kind of work and that this disability was expected to last her lifetime. (R. at 199.)

Church saw Dr. Fonseca on February 19, 2007, after having seen Dr. McBride for a year. (R. at 224.) She stated that she wished to return to treatment with Dr.

---

[7]Other diagnoses were rendered, but the notes are illegible.

Fonseca. (R. at 224.) Church noted some tingling in her left foot, and she stated that her low back pain was more severe. (R. at 224.) Her blood pressure was 130/96, but she was in no acute distress. (R. at 224.) Physical examination revealed tenderness in the lower lumbar area and both sacroiliac joints to palpation. (R. at 224.) Church exhibited muscle spasm bilaterally along the paralumbar area. (R. at 224.) Straight leg raise testing was negative bilaterally, as was Patrick's sign.[8] (R. at 224.) Deep tendon reflexes were 2+ for patellar and Achilles' tendon bilaterally. (R. at 224.) Pinprick sensation revealed paresthesias over the entire left foot with no definite dermatomal pattern. (R. at 224.) There was no muscle atrophy. (R. at 224.) Dr. Fonseca diagnosed Church with hypertension, probably elevated by pain that day and which definitely needed better control, fibromyalgia, osteoarthritis, mixed lipidemia, hypothyroidism, positive ANA[9] and increased low back pain and paresthesias of the left lower extremity, rule out radiculopathy. (R. at 224.) Dr. Fonseca ordered additional lab work, including a lupus panel. (R. at 225.)

On June 19, 2007, William R. Andrews, a physical therapist at Apple Rehab, completed a physical capacity evaluation of Church. (R. at 238-47.) Andrews administered various tests, which showed that Church had a moderate to high perception of disability. (R. at 245.) Although the Waddell Symptom Test was positive, indicating poor effort on testing, Andrews noted that observation during testing revealed that Church did not hold back, and he concluded that test efforts were

---

[8]While the patient is supine, the thigh and knee are flexed and the external malleolus is placed over the patella of the opposite leg. The knee is depressed, and if pain is produced thereby, arthritis of the hip is indicated. *See* Dorland's at 1688.

[9]There is no diagnostic testing contained in the record to support such a finding.

-18-

valid and consistent with Church's true physical ability. (R. at 245.) The Dallas Pain Questionnaire[10] signified pain as a major component of Church's life, and observations during testing confirmed that pain inhibition was a constant influence on her ability to perform physically or to assume postures for performing tasks. (R. at 245.)

Andrews found that Church's test results, according to National Institute for Occupational Safety and Health definitions, classified her recommended work level as negligible to sedentary. (R. at 247.) He concluded that Church was limited to sitting for up to 20 minutes without interruption, standing for up to 15 minutes without interruption and continuously walking for less than 1/8 of a mile. (R. at 247.) He opined that she should avoid bending with lifting from below knee level and that work should be limited to a waist-high work surface. (R. at 247.) Andrews further opined that Church should avoid constant repetitive overhead lifting, and he found that she was unable to perform most activities involving kneeling, squatting, crawling and climbing. (R. at 247.) He opined that Church did not meet the physical demands of her previous employment and was unlikely to find alternate employment of a safe or suitable nature. (R. at 247.)

In a letter to Church's attorney, dated June 25, 2007, Norman E. Hankins,

---

[10]The Dallas Pain Questionnaire is a 16-item visual analog tool used to evaluate a low back pain patient's cognitions about the percentage that chronic pain affects four aspects of the person's life: (1) daily activities including pain and intensity, personal care, lifting, walking, sitting, standing and sleeping; (2) work and leisure activities including social life, traveling and vocational; (3) anxiety-depression; and (4) social interest that includes interpersonal relationship, social support and punishing responses. *See* http://www.oarsi.org/pdfs/pain_indexes/DALLAS_PAIN_QUESTIONNAIRE_INFO.pdf.

Ed.D., a certified vocational expert, opined that if Church was limited to "negligible and sedentary work," as concluded by Andrews, then she probably was not capable of gainful employment. (R. at 250-51.) Hankins further opined that pain/discomfort of the intensity that would require position changes every 15 to 20 minutes would prevent an individual from meeting the production requirements of work at any exertional level, including sedentary work. (R. at 251.) In sum, Hankins stated that if he were asked to assume an individual of Church's age, education and prior work experience who was limited as demonstrated by the functional capacity evaluation performed by Andrews, she would not be able to perform any jobs. (R. at 251.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the

-20-

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 11, 2007, the ALJ denied Church's claims. (R. at 14-24.) The ALJ found that the medical evidence established that Church suffered from severe impairments, namely fibromyalgia, osteoarthritis with low back pain, hypothyroidism, partial deafness, hypertension and depression, but she found that Church did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-17.) The ALJ found that Church had the residual functional capacity to perform a limited range of light work. (R. at 20.) Thus, the ALJ concluded that Church could not perform her past relevant work as a hairdresser. (R. at 22.) Based on Church's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that she could perform, including those of a sedentary surveillance monitor, as well as a fast food worker, a gate guard and a ticket taker, all at the light level of exertion. (R. at 22-23.) Therefore, the ALJ concluded that Church was not disabled under the Act and was not eligible for DIB or SSI benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

-21-

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if she sufficiently explains her rationale and if the record supports her findings.

Church argues that the ALJ erred in her evaluation of her symptoms and the weighing of the medical evidence in determining her residual functional capacity. (Memorandum In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 3.) She also argues that the ALJ posed an incomplete hypothetical to the vocational expert, thereby resulting in an improper finding that jobs existed in

significant numbers in the national economy that she could perform. (Plaintiff's Brief at 3.) Finally, Church argues that the Appeals Council erred by failing to evaluate and/or remand her case to the ALJ for consideration of the evidence from Apple Rehab and Hankins, both submitted to the Appeals Council subsequent to the hearing. (Plaintiff's Brief at 3-4.)

### A.    Credibility Determination

I first will address Church's argument that the ALJ erred in her credibility determination. For the reasons that follow, I find this argument to be without merit. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about her pain may not
> be discredited solely because they are not substantiated by
> objective evidence of the pain itself or its severity, they

-23-

need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers ...

76 F.3d at 595.

Here, the ALJ found that Church's medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but that Church's statements regarding the intensity, persistence and limiting effects of those symptoms were not entirely credible. (R. at 22.) While the ALJ did note in her decision that Church received subsidized housing, food stamps and Medicaid and that she received financial support from her parents and her daughter's father, thereby giving her no incentive to work, the ALJ also discussed in detail the medical evidence and Church's own claims of what her daily activities consisted of, to support her credibility finding. (R. at 21-22.) For instance, the ALJ noted that, despite Church's allegation that she had to elevate her legs during the day and had to lie down during the day, Church had stated that she played with her daughter in the back yard, performed a little housework, read to her daughter, drove, used the telephone, watched television and occasionally went shopping. (R. at 21.) The court notes that no treating source contained in the record advised Church to elevate her legs or lie down daily. The ALJ also noted that Church had received only conservative treatment for her back and leg pain and that there were no objective findings indicative of significant musculoskeletal problems. (R. at 22.) Moreover, the ALJ indicated that Church had demonstrated a normal gait, full range of motion in all joints and normal extremities with no edema. (R. at 22.) She further indicated that, despite allegations of depression, Church had

-24-

not received any mental health treatment and had not experienced any episodes of decompensation. (R. at 22.)

As in the case of other factual questions, credibility determinations as to a claimant's testimony regarding her pain are for the ALJ to make. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). Thus, it is well-settled that an ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight when it is supported by the record. *See Shively*, 739 F.2d at 989-90. To hold that an ALJ may not consider the relationship between the objective evidence and the claimant's subjective testimony as to pain would unreasonably restrict the ALJ's ability to meaningfully assess a claimant's testimony. It is clear to the court from the ALJ's decision, that she correctly assessed Church's credibility as to the severity of her pain and resulting limitations in accordance with controlling circuit case law and that her finding is supported by the record. While the ALJ's comments regarding Church's receipt of financial assistance from various sources and its impact on her motivation to work are speculative, as Church contends, even absent those statements, the ALJ's credibility finding is supported by the record as a whole.

B.    *Evidence Submitted to the Appeals Council*

Church also argues that the Appeals Council erred by failing to evaluate and/or remand her case to the ALJ for consideration of the evidence from Apple Rehab and Hankins. For the following reasons, I agree. It is well-settled that the Appeals Council must consider evidence that is submitted if that additional evidence is new,

-25-

material and relates to the period on or before the date of the ALJ's decision. *See* 20 C.F.R. §§ 404.970, 416.1470 (2007).; *see also Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991). The ALJ's decision in this case was dated May 11, 2007, and the functional capacity evaluation and the letter from Hankins were dated June 19, 2007, and June 25, 2007, respectively. Nonetheless, the Appeals Council noted in its decision that it considered this evidence, but concluded that it did not provide a basis for changing the ALJ's decision. (R. at 6-9.)

Since the Appeals Council considered the functional capacity evaluation and the letter from Hankins in reaching its decision not to grant review, (R. at 6-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins*, 953 F.2d at 96. That being the case, I cannot find that substantial evidence supports the ALJ's residual functional capacity finding and ultimate disability determination. Andrews, the physical therapist who conducted the evaluation, found that Church's recommended work level was negligible to sedentary. (R. at 247.) He opined that Church could sit for up to only 20 minutes without interruption, stand for up to only 15 minutes without interruption and continuously walk for up to only 1/8 of a mile. (R. at 247.) Andrews opined that she should avoid bending with lifting from below knee level and that work should be limited to a waist-high work surface. (R. at 247.) He further opined that Church should avoid constant repetitive overhead lifting, and he found that she was unable to perform most activities involving kneeling, squatting, crawling and climbing. (R. at 247.) Andrews concluded that Church did not meet the physical demands of her previous employment and was unlikely to find alternate employment of a safe or

suitable nature.  (R. at 247.)

Clearly, some of the limitations imposed by Andrews are much harsher than those imposed by Dr. Blackwell and the state agency physicians, upon whom the ALJ relied in making her residual functional capacity finding.  I note that Dr. Blackwell even stated in his opinion that a functional capacity evaluation might better delineate objectively Church's limitations. (R. at 145.)  Furthermore, vocational expert Hankins stated in his letter that, an individual of Church's age, education and work history who was limited as set forth in Andrews's functional capacity evaluation could not perform any job. (R. at 251.)  Thus, contrary to the Appeals Council's finding, I find that there is a reasonable possibility that had this evidence been before the ALJ, the outcome might have been different.  That being the case, I find that substantial evidence does not exist to support the ALJ's residual functional capacity finding.  I recommend that this case be remanded for further development.  Given this finding, the court will not address Church's remaining arguments at this time.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence does not exist to support the Commissioner's residual functional capacity finding; and

-27-

2. Substantial evidence does not exist to support the Commissioner's finding that Church was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny the Commissioner's and Church's motions for summary judgment, vacate the decision of the Commissioner denying benefits and remand the case to the Commissioner for additional consideration pursuant to this decision.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

-28-

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 24th day of June 2008.

/s/   *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-29-